[This opinion has been published in *Ohio Official Reports* at 76 Ohio St.3d 601.]

IN RE ELECTION OF NOVEMBER 7, 1995 FOR THE OFFICE OF MEMBER OF ROCK HILL LOCAL SCHOOL DISTRICT BOARD OF EDUCATION.

[Cite as *In re Election of Member of Rock Hill Bd. of Edn.*, 1996-Ohio-356.]

Elections—Contest of election—R.C. 3515.10, construed and applied—Absent voter's ballot—R.C. 3509.05, construed and applied.

(No. 96-136—Submitted June 25, 1996—Decided October 9, 1996.)

APPEAL from the Court of Common Pleas of Lawrence County, No. 95-OC-873.

_____

{¶ 1} This is an election-contest case which originated in the Court of Common Pleas of Lawrence County. The facts giving rise to this appeal are as follows.

{¶ 2} On November 6, 1995, the day before the general election in Lawrence County, Ohio, Fred Blagg, a qualified voter, filed a petition with the Lawrence County Board of Elections challenging sixty ballots that had been cast by absentee voters. See R.C. 3505.20. Blagg alleged, among other things, that the absentee voters had received assistance in voting and that none of the challenged voters had marked the "assistance box" on his or her application for an absentee ballot. On November 15, 1995, the board of elections conducted a hearing to determine the validity of Blagg's challenges to the absentee ballots. Following the hearing, the board of elections, relying on R.C. 3509.05, voted not to count twenty-four of the sixty challenged ballots on the basis that the ballots had been mailed to the board of elections by persons other than the electors who had cast the ballots.[1]

_____

1. The twenty-four electors whose absentee ballots were rejected by the board of elections on grounds that the ballots had been placed in the mail by a third person were Virgil L. Cole, Richard E. Cole, Russell Wayne Cox, Kenneth A. Drake, Nancy M. Drake, William Lee Wilson, Yvonne Wilson, Billy Lee Wilson, Ronald Lee Holston, Joseph Hutchinson, Alfred E. Rife, Melanie Lee Walters, David Allen Moore, Ronnie Lee Moore, Carl E. Large, Carl Large, Carlos R. Sharp, John

**{¶ 3}** On November 21, 1995, the board of elections met for the official canvassing of ballots. At this meeting, the board received a letter from the Chief Elections Counsel for the Secretary of State of Ohio addressing, among other things, the following question: "Is the ballot of an absentee voter disqualified because someone other than the voter mails the completed ballot and identification envelope to the board of elections?" The Chief Elections Counsel answered this question in the negative, stating that, "No where [*sic*] in this section [R.C. 3509.05] does it provide that if someone other than the elector mails the ballot or a family member returns the ballot, that the ballot, if otherwise properly voted, is disqualified. * * * The error in mailing, if any, is technical under R.C. 3505.28 and the voter's ballot should be counted." However, despite this advice, the board of elections continued to adhere to its prior determination that R.C. 3509.05 required disqualification of the twenty-four ballots in question. On November 22, 1995, the board of elections certified the official results of the November 7, 1995 general election. In the race for the Office of Member of the Rock Hill Local School District Board of Education, the three declared winning candidates and their corresponding vote totals were Fred Wells (1,406 votes), Terry L. Barker (1,363 votes), and appellant Wanda Jenkins (1,255 votes). Jimmy Dale Massie, appellee, finished fourth in the race, just sixteen votes behind Jenkins.

---

Nelson III, Phyllis Nelson, John L. Nelson, Manuel Russell, Justin Sharp, John Clifton Thomas and Mona Lisa Keeton. However, the evidence before the board of elections at the November 15, 1995 hearing established that five of these electors (Richard E. Cole, Kenneth A. Drake, Nancy M. Drake, Yvonne Wilson, and Ronald Lee Holston) had completed their own absentee ballots and had personally mailed the completed ballots back to the board of elections. At least two other electors whose ballots were rejected (Billie Lee Wilson and Mona Lisa Keeton) testified at the hearing but were never asked who had mailed their ballots to the board of elections. Several other electors whose ballots were rejected did not testify at the hearing and, thus, there was no evidence concerning who had placed their completed ballots in the mail. As to the remaining electors whose ballots were rejected on the basis that they had not personally mailed the ballot back to the board of elections, the evidence at the November 15 hearing revealed that each of these electors had personally cast his or her individual ballot and that the completed ballot had been placed in the mail by either a close friend, a family member, or a relative.

**{¶ 4}** On December 4, 1995, Massie filed, in the Court of Common Pleas of Lawrence County, a petition to contest the election. In his complaint, Massie alleged that the board of elections had abused its discretion in failing to count the twenty-four absentee ballots that had been rejected by the board on grounds that the ballots had been mailed by persons other than the electors who had cast the ballots. In the complaint, Massie also claimed that "[t]he day before the November 7, 1995 general election and prior to the close of regular business hours, five (5) individuals personally requested to vote absentee ballots at the office of the Board of Elections. The five gave as their reasons for voting absentee that they would be out of the county on election day. Two of the five were permitted to cast absentee ballots. The other three, namely William Perry, Alberta Wilds, and Kathy Bamer were not permitted [to] apply for or cast absentee ballots." In this regard, Massie alleged that the board of elections had abused its discretion in refusing to provide absent voter's ballots to the three electors who had been denied the right to vote.

**{¶ 5}** On December 18, 1995, the trial court conducted an evidentiary hearing in the election contest action. On December 28, 1995, the trial court issued a decision and judgment entry upholding Massie's challenges to the election. With respect to the twenty-four absentee ballots that had been rejected by the board of elections, the trial court held that "[i]n light of the public policy favoring the counting of ballots, and the absence of statutory language in R.C. 3509.05 specifying that an elector must personally place his or her ballot in the mail back to the Board of Elections, it is my opinion that, under the facts of this case, that the twenty-four absentee ballots at issue must be counted." With respect to the three electors who had been refused absentee ballots at the board of elections' office the day before the general election (William Perry, Alberta Wilds, and Kathy Bamer), the trial court determined that the board of elections had improperly denied them the right to vote, stating that "[t]estimony presented at trial established that three electors who attempted to vote by absentee ballot at the Board of Elections' office

the day before the election, before the close of regular business hours, were misinformed by the Board that they were not entitled to vote. * * * There is absolutely no question, but that these three electors were entitled to vote an absentee ballot." Accordingly, in its December 28, 1995 entry, the trial court ordered that Perry, Wilds and Bamer be allowed to cast absentee ballots in connection with the November 7, 1995 general election, that the board of elections count such ballots along with the twenty-four challenged absentee ballots, that the board combine the results of these votes with the previously certified results of the November 7 general election, and that the board "amend the abstracts of such election and issue new certificates of election in any election where the outcome changes." Additionally, the trial court ordered the board of elections to pay Massie $5,931 in attorney fees and expenses.

{¶ 6} On January 10, 1996, the trial court ordered the board of elections to complete the counting of the absentee ballots and the certification of results no later than January 16, 1996. On January 16, the trial court conducted a hearing to address certain issues that had been raised by the board of elections concerning the manner in which the absentee ballots were to be counted. On January 17, 1996, Jenkins filed in this court a timely notice of appeal from the trial court's December 28, 1995 judgment entry. Jenkins's appeal was submitted directly to this court pursuant to R.C. 3515.15.[2] Additionally, on January 18, 1996, the board of elections filed a notice of appeal in this court from the trial court's December 28, 1995 judgment entry. Thereafter, Massie moved to dismiss both appeals as untimely filed. On

---

2. R.C. 3515.15 provides:

"The person against whom judgment is rendered in a contest of election may appeal on questions of law, within twenty days, to the supreme court; but such appeal shall not supersede the execution of the judgment of the court. Such appeal takes precedence over all other causes upon the calendar, and shall be set down for hearing and determination at the earliest convenient date. The laws and rules of the court governing appeals apply in the appeal of contested election cases. If the judgment of the lower court is affirmed, the supreme court shall order the judgment of such lower court to be enforced, if the party against whom the judgment is rendered is in possession of the office."

March 4, 1996, the trial court issued a judgment entry clarifying its orders of December 28, 1995 and January 10, 1996, by specifying, among other things, the precise manner in which the absentee ballots were to be counted and tallied.[3]  On May 8, 1996, we granted Massie's motion to dismiss the board of elections' appeal, but denied the motion to dismiss Jenkins's appeal.  See 75 Ohio St.3d 1475, 663 N.E.2d 1302.  The cause is now before us on Jenkins's R.C. 3515.15 appeal from the trial court's December 28, 1995 judgment entry.

―――――――――――

*Craig A. Allen*, for appellant.

*McTigue & Brooks* and *Donald J. McTigue*, for appellee.

―――――――――――

**DOUGLAS, J.**

{¶ 7} Jenkins presents a number of issues for our consideration.  We have carefully reviewed Jenkins's arguments and have conducted a thorough review of the record.  For the reasons that follow, we affirm the judgment of the trial court in all respects.

―――――――――――――――――――

3.  The trial court's March 4, 1996 judgment entry reads, in part:

"Upon consideration of statements of counsel during the oral hearing [of January 16, 1996], and the statements of the president of the Board of Elections during the oral hearing, the Court hereby Orders, Adjudges and Decrees the following:

"1.  All of the ballots which are the subject of this election contest shall be counted by personnel of the Board of Elections by hand.  This includes the twenty-four (24) absentee ballots which had been previously held by the Board, as well as the three (3) ballots completed by the walk-in voters pursuant to this Court's previous Orders.

"2.  The Board of Elections shall count and tally only the votes in the contested race (the Rock Hill School Board election), and shall disregard all votes on all ballots for all other candidates and/or issues.

"3.  The Board of Elections shall issue a new Certificate of Election if the result in this contested race is changed as a result of these twenty-seven (27) previously uncounted votes.

"4.  The Board of Elections shall issue a revised Certificate of Election to the Secretary of State of Ohio concerning the results of this contested race only.

"5.  The Board of Elections shall count and tally all twenty-seven (27) votes together regardless of the township and/or precinct in which each voter votes.

"6.  The Board of Elections shall so certify the result of the contested race to the Secretary of State of Ohio without regard to township and precinct location."

I

{¶ 8} Massie filed this election contest action in the Court of Common Pleas of Lawrence County on December 4, 1995. On December 18, 1995, the trial court conducted a hearing on the petition. Thus, the hearing occurred just *fourteen days* after the action had been filed. In this regard, Jenkins suggests that the trial court failed to strictly comply with the requirements of R.C. 3515.10 and that, therefore, the court had no jurisdiction to hear and determine the election contest action. We disagree.

{¶ 9} R.C. 3515.10 provides:

"The court with which a petition to contest an election is filed shall fix a suitable time for hearing such contest, which shall not be less than fifteen nor more than thirty days after the filing of the petition. * * * All parties may be represented by counsel and the hearing shall proceed at the time fixed, unless postponed by the judge hearing the case for good cause shown by either party by affidavit or unless the judge adjourns to another time, not more than thirty days thereafter, of which adjournment the parties interested shall take notice."

{¶ 10} R.C. 3515.10 clearly contemplates that a hearing on a petition to contest an election will be conducted (except in certain circumstances such as in the case of an adjournment) not less than fifteen nor more than thirty days after the filing of the petition. Specifically, R.C. 3515.10 requires a trial court to fix a "suitable time" for hearing an election contest action and that the time set for trial shall not be less than fifteen nor more than thirty days after the filing of the petition to contest the election. In a series of prior cases, this court has held that the hearing scheduling requirements of R.C. 3515.10 are jurisdictional in nature. The leading cases on this issue are *In re Contested Election of November 2, 1993* (1995), 72 Ohio St.3d 411, 650 N.E.2d 859; *McCall v. Eastern Local School Dist. Bd. of Edn.* (1959), 169 Ohio St. 50, 8 O.O.2d 11, 157 N.E.2d 351; and *Jenkins v. Hughes* (1952), 157 Ohio St. 186, 47 O.O. 127, 105 N.E.2d 58.

{¶ 11} However, each of these three cases dealt with a situation markedly different from the situation presented in the case at bar. Specifically, *In re Contested Election*, *McCall* and *Jenkins*, *supra*, each dealt with a situation involving some failure to observe the *thirty-day time limitation provisions* of R.C. 3515.10 (or its predecessor) which, on the facts of those cases, was considered to be a jurisdictional defect. For instance, in *In re Contested Election*, *supra*, 72 Ohio St.3d 411, 414, 650 N.E.2d 859, 862, we stated that "[c]ompliance with the R.C. 3515.10 hearing scheduling requirement is jurisdictional, and where the trial date of the election contest is not set *within thirty days* after the filing of the petition and no request is made for the scheduling of a hearing within that period, the court lacks jurisdiction to proceed." (Emphasis added.) See, also, *McCall*, *supra*, 169 Ohio St. 50, 52, 8 O.O.2d 11, 12-13, 157 N.E.2d 351, 353 ("Under the controlling statute [R.C. 3515.10], the setting of the hearing of a contested election not more than 30 days after the filing of the petition and the service of a copy of the petition on the contestee are express conditions precedent which must be complied with before the hearing of the contest can be had."); and *Jenkins*, *supra*, 157 Ohio St. 186, 190, 47 O.O. 127, 129, 105 N.E.2d 58, 60 ("[W]here a contester, before the expiration of the time within which an election contest under a statute must be tried, obtains a postponement or acquiesces in a postponement which carried the case beyond the time limit, he thereby discontinues his contest.").

{¶ 12} Here, Massie's election contest action was set for trial (and was tried) prior to the expiration of the thirty-day time limitation set forth in R.C. 3515.10, *but less than fifteen days after the filing of the petition*. Commencing the trial less than fifteen days after the filing of the petition constituted a technical violation of R.C. 3515.10. However, the fact that the trial court conducted the hearing in this case one day *earlier* than R.C. 3515.10 technically authorized does not amount to a jurisdictional defect. Unlike *In re Contested Election*, *McCall* and *Jenkins*, *supra*, Massie's election contest action was promptly scheduled and

prosecuted within thirty days of the filing of the petition. We have held, time and again, that extreme diligence and promptness are required in election-related matters. See, *e.g.*, *In re Contested Election*, *supra*, 72 Ohio St.3d at 413, 650 N.E.2d at 862. See, also, *Jenkins*, *supra*, 157 Ohio St. at 190, 47 O.O. at 129, 105 N.E.2d at 60 ("The public interest in having election contests speedily determined requires promptitude."). Moreover, as we recognized in *State ex rel. Byrd v. Summit Cty. Bd. of Elections* (1981), 65 Ohio St.2d 40, 43, 19 O.O.3d 230, 232, 417 N.E.2d 1375, 1378: "The purpose of the specific time limitation within election statutes is to provide promptness and certainty in our elections in a reasonable manner." Apparently, Jenkins believes that the trial court, pursuant to R.C. 3515.10, should have waited one more day before conducting the hearing. However, the only thing that would have been accomplished by waiting the extra day would have been to prolong (albeit by just one day) a final resolution in this matter. Accordingly, on the facts of this case, we find no error rising to the level of a jurisdictional defect.

II

{¶ 13} Turning our attention to the merits of this appeal, Jenkins argues that the trial court erred in ordering the board of elections to count the twenty-four absentee ballots that had (allegedly) been mailed back to the board by persons other than the electors who had cast the ballots. We reject Jenkins's arguments in this regard.

{¶ 14} The board of elections disqualified the twenty-four ballots based upon an improper interpretation of R.C. 3509.05. Specifically, the board apparently believed that R.C. 3509.05 requires that the ballot of an absentee voter must be disqualified if someone other than the voter mails the completed ballot and identification envelope to the director of the board of elections. However, nothing in R.C. 3509.05 required disqualification of the ballots in question.

{¶ 15} R.C. 3509.05(A) provides, in part:

"When an absent voter's ballot, pursuant to his application or request therefor, is received by the elector, he shall, before placing any marks thereon, note whether there are any voting marks on the ballot. In the event there are any voting marks, the ballot shall be returned immediately to the board of elections; otherwise he shall cause the ballot to be marked, folded in such manner that the stub thereon and the indorsements and facsimile signatures of the members of the board of elections on the back thereof are visible, and placed and sealed within the identification envelope received from the director of elections for that purpose. Then the elector shall cause the statement of voter on the outside of the identification envelope to be completed and signed, under penalty of election falsification.

"*The elector shall then mail the identification envelope to the director from whom it was received in the return envelope*, postage prepaid, *or he may personally deliver it to the director*, or the spouse of the elector, the father, mother, father-in-law, mother-in-law, grandfather, grandmother, brother, or sister of the whole or half blood, or the son, daughter, adopting parent, adopted child, stepparent, stepchild, uncle, aunt, nephew, or niece of the elector may deliver it to the director, but the return envelope shall be transmitted to the director in no other manner, except as provided in section 3509.08 of the Revised Code." (Emphasis added.)

{¶ 16} R.C. 3509.05 requires an absentee voter to either (1) "mail" the identification envelope containing his or her ballot to the director of the board of elections, or (2) "personally deliver" the ballot (or have some person specified in the statute deliver the ballot) to the director of the board of elections. R.C. 3509.05 does not mandate that an absentee voter *personally* mail his or her ballot and identification envelope to the director of the board of elections. The term "personally" in R.C. 3509.05 is used only in connection with the phrase "personally deliver." Had the General Assembly intended to impose an obligation on an absentee voter to personally mail his or her ballot and identification envelope to the

board of elections, it certainly knew how to do so, *i.e.*, the term "personally" could easily have been inserted in R.C. 3509.05 immediately before the term "mail." Given that the General Assembly expressed no such intention, we presume that R.C. 3509.05 imposes no obligation on an absentee voter to *personally* place his or her ballot and identification envelope in the mailbox. Therefore, the fact that someone else actually deposits the ballot in the mail is of no legal significance.

{¶ 17} Moreover, even if R.C. 3509.05 could be construed as requiring an absentee voter to personally place his or her ballot and identification envelope in the mail, R.C. 3505.28 provides, "No ballot shall be counted which is marked contrary to law, except that *no ballot shall be rejected for any technical error* unless it is impossible to determine the voter's choice." (Emphasis added.) Here, any error in mailing was purely technical in nature. There was no evidence of fraud with respect to these ballots and, as the trial court noted, "requiring a voter to personally place his or her ballot in a mailbox or hand it to a postal worker in order for the ballot to be counted raises form over substance." Under these circumstances, and in light of the policy of the law favoring free and competitive elections (see, *e.g.*, *State ex rel. Giuliani v. Cuyahoga Cty. Bd. of Elections* [1984], 14 Ohio St.3d 8, 10, 14 OBR 314, 316, 471 N.E.2d 148, 149; *Stern v. Cuyahoga Cty. Bd. of Elections* [1968], 14 Ohio St.2d 175, 184, 43 O.O.2d 286, 291, 237 N.E.2d 313, 319; and *State ex rel. Hanna v. Milburn* [1959], 170 Ohio St. 9, 12, 9 O.O.2d 332, 333-334, 161 N.E.2d 891, 894), the trial court found that the twenty-four challenged electors had substantially complied with the requirements of R.C. 3509.05. We agree that at a *minimum* the twenty-four voters "substantially" complied with R.C. 3509.05.

{¶ 18} Accordingly, we find that the board of elections' interpretation of R.C. 3509.05 was contrary to law, and that the trial court was correct in ordering the counting of the twenty-four absentee ballots.

{¶ 19} Jenkins also suggests that the trial erred in finding that the three electors who were refused absentee ballots at the board of elections' office the day before the November 7, 1995 general election (William Perry, Alberta Wilds, and Kathy Bamer) had been improperly denied the right to vote. Jenkins's arguments are not well taken.

{¶ 20} The three electors attempted to vote by absentee ballot at the board of elections' office, during regular business hours, the day before the November 7, 1995 general election. Each of the electors had planned to be out of the county on the day of the election for personal or business reasons. However, the board of elections denied the electors the right to vote based on an advisory that had been issued by the Secretary of State of Ohio on August 25, 1995. The advisory contained a summary of the provisions of Am. Sub. H.B. No. 99, effective August 22, 1995, but mistakenly indicated that the current version of R.C. 3509.03 authorizes voters to request absentee ballots at the board of elections' office the day before an election *only if* there is some "unforeseen emergency" requiring the voter to be absent from the county on election day. R.C. 3509.03 contains no such restriction on the right to request absentee ballots at the board of elections' office the day before an election.[4] The three electors, upon being informed that they could

---

4. R.C. 3509.03 provides, in part:

"Except as provided in division (B) or (C) of section 3503.16, section 3509.031, or division (B) of section 3509.08 of the Revised Code any person desiring to vote absent voter's ballots at an election shall make written application for such ballots to the director of elections of the county in which such person's voting residence is located. The application need not be in any particular form but shall contain words which, liberally construed, indicate the request for ballots, the election for which such ballots are requested, and, if the request is for primary election ballots, the person's party affiliation. The application for such ballots shall state that the person requesting the ballots is a qualified elector, and the reason for the person's absence from the polls on election day. The application shall include sufficient information to enable the director to determine the precinct in which the applicant's voting residence is located and shall be signed by the applicant. If the applicant desires ballots to be mailed to the applicant, the application shall state the mailing address.

"* * *

"Each application for absent voter's ballots shall be delivered to the director not earlier than the first day of January of the year of the elections for which the absent voter's ballots are requested or not earlier than ninety days before the day of the election at which the ballots are to be

not vote, left the board of elections' offices without voting and without having tendering written applications for absentee ballots.

{¶ 21} Jenkins suggests that the board of elections reasonably relied on the summary of R.C. 3509.03 contained in the advisory issued by the Secretary of State in refusing to allow the three electors the right to vote. However, there is no question that, pursuant to R.C. 3509.03, the three qualified electors had an absolute right to walk into the board of elections' office the day before the election and apply for, receive, and cast absentee ballots, notwithstanding the fact that there was no "unforeseen emergency" requiring that they do so. Each of the electors was a qualified absentee voter because each had planned to be (and was) out of the county on election day. See R.C. 3509.02(A)(7). The summary of R.C. 3509.03 relied upon by the board of elections was clearly erroneous and could not constitute a legitimate basis to deny these electors the right to vote.

{¶ 22} Additionally, Jenkins argues that the board of elections properly denied the three electors the right to vote because, contrary to R.C. 3509.03, the electors had failed to tender written applications for the absentee ballots. However, the reason the board denied the electors the right to vote was based on the Secretary of State's advisory that contained significant errors concerning R.C. 3509.03—not because the electors had failed to tender written applications for absentee ballots. Additionally, these electors testified that they would have filed the appropriate written application but for the fact they were told by the board that they could not vote.

{¶ 23} For all of the foregoing reasons, we reject Jenkins's arguments that the trial court erred in upholding Massie's election contest action. The record is

---

voted, whichever is earlier, and not later than twelve noon of the third day before the day of the election at which such ballots are to be voted, or not later than the close of regular business hours on the day before the day of the election at which the absent voter's ballots are to be voted if the application is delivered in person to the office of the board."

clear that the board of elections (1) disqualified and refused to count twenty-four absentee ballots that should have been counted, and (2) improperly denied three electors (Perry, Wilds and Bamer) the right to vote. Clearly, these election irregularities affected enough votes to change or make uncertain the results of the election for member of the Rock Hill school board.

III

{¶ 24} The bulk of Jenkins's remaining arguments deal with the trial court's post-judgment order of March 4, 1996, wherein the trial court clarified, among other things, the procedure by which the board of elections was to count and tally the twenty-seven ballots the court had ordered to be counted in its December 28, 1995 judgment entry. First, Jenkins claims that the trial court's post-judgment order disenfranchised the twenty-seven voters because their votes were ordered to be counted only in connection with the race for member of the Rock Hill school board. Specifically, Jenkins suggests that the trial court should have ordered that these votes be counted *on all issues and in all races* on the November 7, 1995 general election ballot. Second, Jenkins argues that the trial court erred by failing to ensure the secrecy of the twenty-seven ballots by ordering that the ballots be counted by hand and without regard to the township or precinct in which the individual voters had voted. However, assuming that the issues concerning the March 4, 1996 order are properly before us,[5] we find no error requiring reversal of the trial court's judgment.

{¶ 25} With respect to Jenkins's first argument, we find that the trial court's March 4, 1996 order did not impermissibly disenfranchise the twenty-seven voters whose ballots the trial court had ordered to be counted only in connection with the race for member of the Rock Hill school board. The local school board race was

---

5. We note that Jenkins never amended her notice of appeal from the trial court's December 28, 1995 judgment entry to include, in this appeal, arguments concerning the trial court's post-judgment order of March 4, 1996.

the only race at issue in Massie's election contest action and, thus, the question how the twenty-seven electors had voted in other races had no bearing on the issue before the trial court. Moreover, it is clear that Jenkins suffered no prejudice as a result of the alleged error.

{¶ 26} As to Jenkins's second argument, we find that the trial court's post-judgment order was sufficient to ensure the secrecy of the ballots. Apparently, each of the twenty-seven voters at issue was registered in precincts within the Rock Hill Local School District. Twenty-five of the twenty-seven voters lived in one township while the remaining two voters lived in a separate township. Had the trial court ordered that the twenty-seven votes be counted, tallied, and reported to the Secretary of State by precinct, the secrecy of these votes may have been compromised. Accordingly, the trial court ordered the board of elections to count all twenty-seven ballots by hand and without regard to precinct to preserve—not destroy—the secrecy of the ballots. Nevertheless, Jenkins suggests that ordering the board of elections to count the ballots by hand violated R.C. 3599.20. That statute prohibits a person from, among other things, attempting to "induce an elector to show how he marked his ballot at an election." We fail to see how R.C. 3599.20 even applies under the facts of this case. Further, and in any event, it is clear that Jenkins suffered no prejudice as a result of the trial court's post-judgment order requiring the counting of ballots by hand and without regard to the precinct.

{¶ 27} Accordingly, Jenkins's arguments concerning the trial court's March 4, 1996 order are not persuasive.

IV

{¶ 28} As a final matter, Jenkins contends that the trial court had no authority to award attorney fees in favor of Massie and against the board of elections. However, the trial court specifically ordered the *board of elections* to pay Massie's attorney fees, and Jenkins has failed to demonstrate that she was adversely affected by this order. Under these circumstances, we find that Jenkins

has no standing to challenge the award of attorney fees. Rather, that issue should have been raised by the board of elections in a *timely* appeal to this court.

V

**{¶ 29}** For the foregoing reasons, we affirm the sound and well-reasoned judgment of the trial court.

*Judgment affirmed.*

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and STRATTON, JJ., concur separately.

_____

**COOK, J., concurring separately.**

**{¶ 30}** While I generally agree with the conclusion reached by the majority in this case, I write to clarify my reasons for determining that R.C. 3515.10, as applied, does not bar a court from exercising jurisdiction over an election contest action heard fourteen days after it was filed.

**{¶ 31}** R.C. 3515.10 directs a court to fix a hearing on an election contest petition no less than fifteen nor more than thirty days after a petition is filed. While we have previously construed the thirty-day limit to impose a bar to the court's exercise of jurisdiction, the same conclusion is not foreclosed with respect to the fifteen-day waiting period.

**{¶ 32}** The thirty-day limit is tied to the public interest in having the election contest expeditiously determined. *Jenkins v. Hughes* (1952), 157 Ohio St. 186, 190, 47 O.O. 127, 128-129, 105 N.E.2d 58. The structure of R.C. 3515.10 reveals the purpose of the fifteen-day waiting period. The contestee is permitted ten days from the date of service to answer the contestor's petition. The contestor is then given five days to reply to the answer of the contestee. The aggregate of the filing deadlines is fifteen days. Where the responsive pleadings have been filed and served in fewer than fifteen days, there is no compelling reason to delay a hearing on the petition.

{¶ 33} Accordingly, in a case such as this, where appellant does not contend that she was given inadequate time to prepare an answer to the contest petition, a hearing commenced earlier than prescribed by R.C. 3515.10 will not invalidate the court's ruling on the contest petition as an extrajurisdictional act. The earlier hearing date is not at odds with the purpose and structure of the statute.

MOYER, C.J., and STRATTON, J., concur in the foregoing concurring opinion.

———————————