## In re REMOVAL OF SITES et al.

[Cite as *In re Removal of Sites*, 170 Ohio App.3d 272, 2006-Ohio-6996.]

Court of Appeals of Ohio,
Fourth District, Lawrence County.

No. 06CA25.

Decided Dec. 22, 2006.

Miller & Rodeheffer, Stephen C. Rodeheffer, for appellants.

Wildman Schooley, L.L.C., Eric M. Schooley and Austin P. Wildman, for appellees.

Per Curiam.

{¶ 1} This is an appeal from a Lawrence County Common Pleas Court judgment that ordered Lavetta Sites, Wanda Jenkins, and Paul Johnson, respondents below and appellants herein, removed from their positions as Rock Hill School District Board of Education members.

{¶ 2} Appellants assign the following error for review and determination:

As a matter of law, the evidence presented by the petitioners in the trial below, failed to establish sufficient evidence to support an order removing the respondents from their duly elected office with the Rock Hill Board of Education.

{¶ 3} Lloyd Evans began his employment with the Rock Hill Local School District in 1965.[1] In 1978, he became superintendent. That same year, appellant Lavetta Sites began her district employment as a payroll clerk. Apparently, they had conflicts over time that worsened in 2000, when Evans refused to support the hiring of Sites's son as an athletic coach. After that episode, Sites's husband reportedly threatened to "get" Evans for the perceived slight.[2]

{¶ 4} In 2002, Lloyd Evans retired. Nevertheless, the Rock Hill Local School Board rehired him as superintendent under a two-year contract. In November 2003, the voters elected Sites and appellant Paul Johnson to the board. Before Sites and Johnson took office, however, the board awarded Evans a new five-year contract. In December 2003, before she became an official board member, Sites contacted several attorneys to clarify the status of Evans's contract.

{¶ 5} On January 6, 2004, the newly reconstituted board held an organizational meeting and elected Sites president.[3] On January 12, 2004, Sites contacted the Vorys, Sater, Seymour & Pease law firm ("Vorys") to discuss Evans's contract. At the board's January 15, 2004 regular session meeting, appellant Wanda Jenkins,[4] another board member, moved to grant Sites the authority to engage a law firm "in her sole and absolute discretion." Sites stated that Vorys attorneys had drafted the motion for her. When board member Jackie Harris asked Sites why they needed an attorney, her question was dismissed as irrelevant. On January 20, 2004, Vorys sent Sites a letter that described its fees and detailed other terms of its proposed representation. Sites returned an executed copy of the letter to Vorys on January 23, 2004, and accepted their terms for district representation.

{¶ 6} At the February 25, 2004 special meeting, Sites, Johnson, and Jenkins voted to go into executive session to discuss personnel matters. Board member Jackie Harris was present at the meeting but refused to participate in what she

---

1. This appeal represents another chapter in the tumultuous history of the Rock Hill Local School District. Other cases that involve disputes within the district include *In re Election of Member of Rock Hill Bd. of Edn.* (1996), 76 Ohio St.3d 601, 669 N.E.2d 1116; *Scherer v. Rock Hill Local School Dist. Bd. of Edn.* (1990), 63 Ohio App.3d 555, 579 N.E.2d 525; *In re Steed* (July 27, 1989), Lawrence App. No. 1909, 1989 WL 411471.

2. The record also indicates that another conflict arose over Sites's severance pay when she retired from the district.

3. The record contains two different copies of minutes—one that shows that a January 6 organizational meeting was held and another that shows a January 8 meeting. Because the testimony indicates that this meeting occurred on January 6, we include that date in our analysis.

4. Wanda Jenkins has been a school board member since the early 1980s. She is a friend and first cousin to Lavetta Sites and a friend to Paul Johnson.

considered an illegal meeting. Board member Troy Hardy was also absent. In executive session, Sites read aloud from a Vorys opinion letter that apparently concluded that Evans's contract violated Ohio law. Sites did not allow other members to see the letter, nor was a copy included in this proceeding. Sites, Jenkins, and Johnson thereupon determined that Evans's five-year contract was void and that his current two-year contract should not be renewed. The board then notified Evans by mail that his employment had been terminated.

{¶ 7} In March 2004, Evans attended the board meeting to discuss the matter. Sites informed Evans that his last day of employment would be in July and that if he did not agree, he could hire counsel and file a lawsuit. When board member Troy Hardy suggested that the board "buy out" Evans's contract, Sites rejected the idea because Evans had not "humble[d] himself down enough." Evans apparently followed Sites's advice, and subsequently the common pleas court determined that his five-year contract was indeed valid and his termination was unlawful.[5]

{¶ 8} The board unsuccessfully attempted to fill the vacant superintendent position, and on August 17, 2004, with the start of the school year fast approaching and no one in place to oversee day-to-day operations, appellants voted to turn over district affairs to the Lawrence County Educational Center Governing Board ("ESC Board"). Appellants all voted in favor of this resolution, while Harris and Hardy voted against it.

{¶ 9} In December 2004, the board once again gained control of the district. By that time, however, the conflict had taken a toll. Between January and November 2004, the board incurred over $127,000 in legal fees in its attempt to terminate Evans. Also, board meetings became so contentious that Sites proposed that uniformed deputies keep order.

{¶ 10} District residents apparently grew weary of the problems and began a petition drive to remove Sites, Jenkins, and Johnson from office. Eventually, a sufficient number of electors signed petitions, and, on March 28, 2005, a complaint for the removal of Sites, Jenkins, and Johnson was filed. The complaint asserted various instances of misfeasance and malfeasance, including, inter alia, sunshine-law violations, abuse of power, perjury, mishandled funds, and violations of board policy. Sites, Jenkins, and Johnson denied the allegations.

{¶ 11} At the three-day jury trial in October 2005, the two sides painted very different pictures of the board's actions. Appellees' evidence indicated that Sites had used her position to execute her vendetta against Evans and that Jenkins

---

5. See *Evans v. Rock Hill Local School Dist. Bd. of Edn.*, Lawrence App. No. 04CA39, 2005-Ohio-5318, 2005 WL 2450162, at ¶ 8. That judgment was appealed, and we dismissed the cause for lack of jurisdiction. Id. at ¶ 21.

and Johnson had acquiesced to her plan. Harris and Hardy, the other board members, testified that they had no meaningful participation in the matter and that when they questioned Sites about board activities with respect to Evans, she rebuffed them. Harris and Hardy also had little success in obtaining information from Vorys. Vorys forwarded legal invoices directly to Sites's home address, and when Harris and Hardy sought information from Vorys about the firm's services, the firm responded that it would deal only with Sites.

{¶ 12} By contrast, Sites denied that she was carrying out a vendetta against Evans. Rather, she contended that her actions were motivated by what she perceived to be an unlawful contract. Jenkins and Johnson both acknowledged that Sites is a friend and someone they trusted.

{¶ 13} After hearing the evidence and counsels' arguments, the jury determined to remove the three board members from office. Appellants appealed that judgment to this court. However, we ultimately dismissed that appeal for lack of jurisdiction because an attorney-fee request was pending and unresolved. See *In re Sites,* Lawrence App. No. 05CA39, 2006-Ohio-3787, 2006 WL 2045814, at ¶ 20 and 21. Subsequently, appellees withdrew their fee request, and the trial court dismissed that portion of their claim. This appeal followed.

{¶ 14} In their sole assignment of error, appellants assert that insufficient evidence supports the jury's verdict. Before we address the merits of the assignment of error, however, we must first address a threshold jurisdictional issue that appellees raise in their brief. Appellees cite R.C. 3.09, which provides that "[t]he decision of the court of common pleas in all cases for the removal of officers may be reviewed on appeal *on questions of law by the court of appeals.*" (Emphasis added.) Appellees argue that appellants have asked us, in essence, to reweigh the evidence, and because this request does not involve a question of law, it is beyond our authority under R.C. 3.09. We disagree.

{¶ 15} The precise argument appellants advance in the case sub judice is that insufficient evidence supports the jury's verdicts. However, sufficiency of the evidence is generally a question of law. Thus, we possess the authority to review the issue of whether sufficient evidence supports the jury's verdicts.

{¶ 16} We now turn to the merits of the assignment of error. Ohio law disfavors the removal of duly elected officials. *2,867 Signers v. Mack* (1979), 66 Ohio App.2d 79, 82, 20 O.O.3d 142, 419 N.E.2d 1108. Elected officials should not be removed from office absent substantial reasons and the conclusion that their continued presence harms the public welfare. *State ex rel. Corrigan v. Hensel* (1965), 2 Ohio St.2d 96, 100, 31 O.O.2d 144, 206 N.E.2d 563.

{¶ 17} R.C. 3.07 governs the removal of an elected official and provides:

> Any person holding office in this state, or in any municipal corporation, county, or subdivision thereof * * * who willfully and flagrantly exercises authority or power not authorized by law, refuses or willfully neglects to enforce the law or to perform any official duty imposed upon him by law, or is guilty of gross neglect of duty, gross immorality, drunkenness, misfeasance, malfeasance, or nonfeasance is guilty of misconduct in office. Upon complaint and hearing in the manner provided for in sections 3.07 to 3.10, inclusive, of the Revised Code, such person shall have judgment of forfeiture of said office with all its emoluments entered thereon against him, creating thereby in said office a vacancy to be filled as prescribed by law. The proceedings provided for in such sections are in addition to impeachment and other methods of removal authorized by law, and such sections do not divest the governor or any other authority of the jurisdiction given in removal proceedings.

Thus, under the statute, (1) "misfeasance" is the improper doing of an act that a person might lawfully do, (2) "malfeasance" is the doing of an act a person ought not to do at all, and (3) "nonfeasance" is the omission of an act that a person ought to do. See *In re Removal of Kuehnle*, 161 Ohio App.3d 399, 2005-Ohio-2373, 830 N.E.2d 1173, ¶ 86.

{¶ 18} Appellees argue that we can only speculate why the jury voted to remove appellants from office. The complaints span 90 paragraphs and set forth various reasons for removing the board members. Also, the jury verdicts do not include specific reasons for the removal decision. The parties did not submit interrogatories to assist us in understanding the jury's decision-making process. As our colleagues on the Twelfth District Court of Appeals noted, however, even a single incident of malfeasance, misfeasance, or nonfeasance may constitute sufficient grounds for removal from office. Id. at ¶ 87, citing *In re Steed* (July 27, 1989), Lawrence App. No. 1909, 1989 WL 411471. Accordingly, to uphold the jury verdicts in the case sub judice, sufficient evidence must appear in the record to establish any one of the instances of alleged misconduct.

{¶ 19} As we indicate below, our review of the evidence adduced at trial reveals that sufficient evidence exists for the jury to have concluded that (1) Sites abused her power, improperly incurred district financial liabilities, and failed to follow ethical guidelines and (2) Jenkins and Johnson acquiesced or participated in Sites's misfeasance and/or malfeasance.

## A. The Vendetta against Lloyd Evans

{¶ 20} During the trial, considerable evidence indicated that Sites used her position to target Evans for personal reasons. Although Sites denied that any animosity exists between them, Evans testified that (1) he and Sites had a contentious working relationship during her district employment and (2) she and

her husband wanted revenge for Evans's decision not to support their son's hiring as an athletic coach. We believe that the evidence supports the view that Sites, with assistance from Jenkins and Johnson, used her position to exact revenge for this perceived personal slight. Obviously, this is an improper use of the trust that voters had vested in Sites.

{¶ 21} Moreover, the district's taxpayers have borne the expense of carrying out this vendetta. District Treasurer Thomas Robinson testified that Vorys payments exceeded $165,000 and that more than $17,000 is still owed. Although some testimony indicated that this amount represents a small portion of the district's budget, Hardy testified that this amount represents 50 to 60 percent of the district's "unencumbered" money.[6]

{¶ 22} The cost of this conflict was more than simply economic, however. Because the district did not have a superintendent at the beginning of the 2004 school year, appellants ceded district operations to the ESC Board. The ESC Board operated the district until December, when it restored control to the board. Obviously, the primary reason for a local board's existence is to maintain local control over the schools. Here, however, the board did not serve the voters' interests when it forfeited local control, particularly when it did so because of a member's personal vendetta against the superintendent.

{¶ 23} Appellants assert that the district surrender was "born of necessity, not choice" because the district had no superintendent and that they had behaved rationally under the circumstances. We disagree. Even if the decision to cede control to the ESC Board was arguably necessary, appellants' voluntary and improper actions prompted the entire episode. In other words, Sites's attempt to terminate Evans placed the district in a position with no superintendent. Those actions resulted in an erroneous cost to the district, both financially and in the failure to maintain local control.

## B. Financial Improprieties

{¶ 24} On January 15, 2004, the board approved a resolution that awarded Sites "sole and absolute discretion" to interview and to retain a law firm. However, Vorys's billing statements indicate that the firm rendered services on January 12 and 13, prior to the resolution. No evidence indicates that anyone other than Sites had contact with Vorys. Thus, a reasonable conclusion is that

---

6. Hardy explained that "unencumbered money" means money not earmarked for other expenses, including salaries, benefits, and utility payments. The board typically spends unencumbered money on items like new textbooks and computers. Thus, 2004 payments to Vorys swallowed a considerable amount of the money that the district could have otherwise used to benefit district students.

Sites had engaged the firm and incurred district liability before she possessed the authority to do so.

{¶ 25} The evidence also reveals that after Sites retained Vorys, she concealed the nature of the services. Vorys forwarded invoices directly to Sites's home, and Treasurer Robinson testified that he did not receive the invoices for payment until November 2004. Even then, Robinson stated, the invoices included multiple redactions that did not indicate exactly what services Vorys had rendered.[7] Although Robinson opposed paying the bills because the services could not be verified, Sites, Jenkins, and Johnson ordered him to pay. However, appellants, as sitting board members, had a duty to safeguard the monies entrusted to their care and to ensure that expenditures were appropriate. In sum, incurring liability for services before one has the authority to do so and demanding payment of liabilities while simultaneously concealing the services for which they were rendered do not, in our view, further the ends of that duty.

## C. Ethical Lapses

{¶ 26} The "Code of Ethics for Members of Ohio Boards of Education" sets forth the following guidelines for board members:

Recognize that as an individual board member I have no authority to speak or act for the board;

Work with other members to establish effective board policies;

Encourage ongoing communications among board members;

* * *

Cooperate with other board members * * * to establish a system of regular and impartial evaluations of all staff;

Refrain from using my board position for benefit of myself, family members or business associates.[8]

{¶ 27} As we noted above, considerable evidence indicated that Sites used her position to exact personal revenge against Evans and that she, acting individually, incurred district legal fees before she possessed authority to do so. Above and beyond that, the evidence reveals that Sites systematically excluded other board members (Harris and Hardy) who disagreed with her views concerning Evans and also ceded district control to the ECS Board.

{¶ 28} First, with respect to the Vorys opinion letter that Sites referred to at the February 25, 2004 meeting, Sites apparently read the letter to the board but

---

7. Our review of the redacted invoices also prevents us from discerning exactly what services Vorys rendered to the board.

8. A copy of the code of ethics was introduced into evidence.

did not permit members to personally review the letter — not even members who had voted with her. Johnson and Jenkins testified that although Sites read the Vorys opinion letter at the February 25 meeting, she did not give the letter to them or to any other member. Johnson and Jenkins were apparently unconcerned about not seeing the letter. The other members, however, requested to see the letter, and Sites refused their request. Sites told the other members that the letter's contents were confidential and that they could not view it. Johnson also admitted that he should have asked to see the letter.

{¶ 29} Second, Sites actively prevented members from gaining access to any materials that Vorys prepared. Vorys sent invoices directly to Sites's home, and she withheld them for most of the year. Invoices were so heavily redacted that they reveal almost nothing about the work performed. Harris testified that she made numerous requests to Sites to reveal information about the legal proceedings against Evans, but her requests were ignored. Interestingly, Hardy and Rich Donahue, another board member during a portion of the time in question, attempted to contact Vorys to obtain information. They stated that Vorys attorneys indicated that they dealt only with Sites.[9]

{¶ 30} Finally, we turn to the incident that the parties refer to as the "breezeway meeting." On August 12, 2004, the day appellants ceded district control to the ESC Board, Sites, Jenkins, and Johnson met with a Vorys attorney in the breezeway of Sites's home. Sites did not invite Harris and Hardy, and she denied that any formal meeting had occurred. Rather, Sites testified that everyone simply sat in her breezeway and watched the rain. The jury, however, could reasonably conclude that appellants, in the absence of the two dissenting board members, discussed strategy.

{¶ 31} The gist of the code of ethics is that no member should act individually. Instead, members should work together, communicate, and include each other in deliberations. We believe that the evidence in this record can reasonably be construed to indicate that (1) Sites used Vorys, in essence, as her personal representative in her quest to terminate Evans's employment, (2) Sites deliberately kept legal materials and billing information from other board members, and (3) Sites excluded members from the decisionmaking process. This activity constitutes a lapse of the code of ethics and a violation of her responsibility as president. Harris and Hardy, both duly elected board members, had an equal right to see all materials that involved the board, to be present at meetings, and to participate in board affairs.

---

9. This testimony, if true, is troubling. Although the situation in the instant case is unusual, one may argue that the firm represented the entire board, not an individual member.

{¶ 32} Although the evidence adduced at trial primarily involved Sites, it also revealed that Jenkins and Johnson either acquiesced or actively participated in Sites's activities. Both Jenkins and Johnson (1) voted to give Sites absolute discretion and control to seek legal counsel, (2) agreed with Sites's quest to terminate Evans's employment, and (3) willingly participated in the breezeway meeting. Neither acted to require Sites to disclose the February 25 opinion letter or other legal materials and invoices that Vorys generated. Thus, the evidence sufficiently establishes that Jenkins and Johnson acquiesced, participated, and were complicit in Sites' activities. Accordingly, we believe that the jury could have reasonably concluded that both Johnson and Jenkins committed nonfeasance in office.

{¶ 33} We emphasize that our function in this matter is not to determine our own particular, individual view of the evidence. Rather, we must determine whether sufficient evidence exists for a reasonable jury to conclude that appellants perpetrated misfeasance, malfeasance, or nonfeasance in office. After our review of the record, we believe that sufficient evidence exists to support the trial court's determination.

{¶ 34} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's assignment of error and affirm the trial court's judgment.

Judgment affirmed.

ABELE and KLINE, JJ., concur.

HARSHA, P.J., dissents.

HARSHA, Presiding Judge, dissenting.

{¶ 35} Upon consideration of the briefs, it appears that the appeal does not present us with a question of law as required by R.C. 3.09. Thus, I would not address the merits but rather would dismiss the appeal as having been improvidently granted.